UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SANDRA VICTOR,

      Plaintiff,

    v.

ELA AREA PUBLIC LIBRARY DISTRICT,

      Defendant.

No. 17 CV 7172

Judge Manish S. Shah

MEMORANDUM OPINION AND ORDER

The ELA Area Public Library District terminated Sandra Victor after a series of contentious meetings. Victor says they fired her because of her sex, age, and because she is married to a Jewish man, and that her coworkers defamed her in the process. The Library says they fired her because she was insubordinate and aggressive, and moves for summary judgment on all counts. The bulk of the parties' disagreement has to do with Victor's job performance; she says she was a perfect employee and they beg to differ. But even if Victor was meeting the Library's legitimate expectations, she has failed to produce evidence that permits an inference of improper motive. The Library's motion is granted.

I.     Legal Standards

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must show that, after "construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving party," *United*

*States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014), a reasonable jury could not return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party is also entitled to summary judgment when the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.    Facts

Plaintiff Sandra Victor, a woman over the age of forty, received positive performance reviews during her tenure as Popular Materials Supervisor for the ELA Area Public Library District. *See* [48] ¶¶ 3, 14, 15; [48-8].[1] She is married to a Jewish man. [48] ¶ 53.

Christen Wiser supervised Victor and is under the age of forty. *See* [48] ¶ 8, 9; [52] ¶ 102. Victor says that Wiser once suggested that Victor should raise her son as a Christian because it would be "easier." *See* [42-8] 95:17–96:13; [42-17] 75:20–77:9; [48] ¶ 55, 58.[2] *See also* [42-6] 46:15–18; 208:21–209:8 (Wiser denies saying this). On

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Victor's responses to the Library's Local Rule 56.1 statement, [48], and the Library's response to Victor's additional Local Rule 56.1 statement, [52], where both the asserted fact and the opposing party's response are set forth in one document. When the parties raised arguments, included additional facts, or failed to cite to supporting material in the record, I disregarded those portions of their statements, responses, or replies. *See* Local Rule 56.1.

[2] During her first deposition, Victor said that Wiser made this statement at work. *See* [42-8] 95:17–96:13. But during her second deposition, Victor said that, having thought about it more, she remembered that Wiser had made the statement at a holiday party that Victor was hosting. [42-17] 75:20–77:9.

another occasion, Victor asked Wiser how she was able to stay silent during spiritual retreats, and Wiser told her that, "if [Victor] had more religion in her life, [she] would really understand" and would be "more calm." [42-8] 97:20–98:8. *See* [48] ¶ 55 (Wiser does not deny saying this).

In early December 2016, a conflict arose between Victor and Wiser over the proper forum for discussing Victor's hours. [48] ¶ 22. After a brief discussion at the front desk of the library (and after a follow-up meeting was cut short in a way that upset Victor, [42-8] 36:14–37:16), Victor sent Wiser an email. [48] ¶ 22; [42-10] at 2–3. Among other things, Victor's email says that one of her coworkers was "notoriously late," that another was physically unable to complete certain tasks and/or too slow, and that it was "insane" that the Library wanted her to be "less conscientious." [42-10] at 2–3. She told Wiser, "[l]et me make sure the department operations run smoothly and in turn it will make you and the department look good." *Id*. at 3.

The next day, Victor, Wiser, Megan Creel (the Human Resource Manager) and Erica Christianson (Wiser's supervisor, the Assistant Director of the Library) had a meeting. [48] ¶¶ 8, 11, 23. Wiser says that they discussed Victor's "lapse in correct communication, the outburst of anger, [and] how best to communicate," and that Victor started blaming other staff members and expressing anger. [48] ¶¶ 23, 25; [42-6] 66:19–69:6, 70:18–20, 73:9–24, 76:7–77:3. Creel say that they discussed Victor's hours, their problems with Victor's communication style, and that Victor was agitated, started blaming other staff members, admitted to cursing and yelling while

speaking to supervisors, and refused to accept Wiser's decisions. [48-2] 50:13–61:18.[3] Wiser's notes from the meeting (which appear to have been modified more than eight months after the meeting in question) reflect that there was discussion about Victor's "high emotion," that she had been acting in a "disrespectful" and "combative" way, that she had been having "a difficult time accepting [Wiser] as [her] department head" and was "resistant to discussions of help or solutions." [48-3] at 3. No one told Victor that the meeting was a step in the disciplinary process. [52] ¶ 89.

Victor's account is different. She says that there was no discussion of her disrespectful communication, extreme emotional reactivity, willful and intentional refusal to accept a reasonable request, or any other aspect of her behavior. [42-8] 54:8–57:23; [42-17] 104:2–106:7. Instead, she says the meeting focused on other employees' mistakes and shortcomings. *See* [42-17] 104:2–105:18. According to her, at one point, when Christianson suggested that Wiser should "[u]tilize [Victor] and her managerial skills," Victor looked at Christianson and said, "I don't think that's going to work." [42-8] 62:1–15. She does not dispute that she started blaming others for her anger and frustration.[4]

---

[3] The Library's Separate Statement of Facts cites to "Ex. C, Creel Dep." *See, e.g.,* [48] ¶ 25. Exhibit C to the Library's Rule 56.1 Statement is a thirty-four page transcript of a deposition of Megan Creel that took place on September 10, 2018, [42-4] at 2, but the Library cites to pages numbered higher than thirty-four. *See, e.g.,* [48] ¶ 25 (citing "Ex. C, Creel Dep. 50:11-51:20, 57:4–19"). Victor did not object to these citations and attached as Exhibit A to her Response to the Library's Local Rule 56.1 Statement a 174-page transcript of a deposition of Megan Creel that took place on August 16, 2018. [48-2]. Wherever the Library has cited to pages of Creel's September deposition that do not exist, and wherever the citations are supported by testimony appearing on that line and page in Creel's August deposition, I have changed the cite to the correct deposition.

[4] This fact is undisputed because Victor has failed to cite evidence that disputes it. Wiser says that, during the December meeting, Victor "started blaming other staff members" and saying

4

Early the following April, Wiser completed a performance review for Victor. [52] ¶ 83; [48-8] at 2–5. On the line titled, "Recommended Merit Increase," Wiser wrote, "3.5%." [48-8] at 2.[5] (Victor says that, later, Creel told her she "must be really good" because she "got the highest raise in the department." [42-17] 96:18–20.) Wiser also wrote that Victor has a "good work ethic," is "fun to work with," and "goes above and beyond," [48-8] at 5, that Victor "will accept team decisions when they make sense to her," *id.* at 3, and that Wiser and Victor were "working on communication style, particularly under stress." *Id.* Matt Womack, Executive Director of the Library, says that this last line was a "clear reference to a conversation … in December relating to aggressive body language and vulgar speech." [42-3] 117:13–20. *See also* [42-6] 84:7–85:4. The review also notes that Victor was being assessed based on her ability to maintain positive working relationships, cooperate with team decisions, and communicate respectfully and professionally. [48-8] at 9–10. Both Wiser and Victor

---

that her coworkers' failures were what justified her outbursts. [42-6] 73:9–16. Victor's Local Rule 56.1 Statement says that this portion of Wiser's recollection of the December 8, 2016 meeting is "contradicted by other evidence in the record." [48] ¶ 26. But the evidence that Victor cites in support of that assertion does not contradict Wiser's account. For instance, Victor cites her own testimony, where she is quoted as saying that, during that same meeting, she told Creel and Wiser about at least one other instance when she believed others were performing poorly, *see* [42-8] 58:15–59:5, 60:1–6, but the quoted testimony does not show that Victor denies making the statements Wiser attributed to her. [42-8] 54:8–63:13; [42-17] 104:2–106:7. Even if assumed to be true, Victor's testimony does not reveal a genuine dispute. As a result, and in all other instances like this one, I have deemed the fact undisputed. Fed. R. Civ. P. 56(e)(2).

[5] The Library disputes that the raise was a "merit increase," but cites no supporting evidence. [52] ¶ 83. The fact is undisputed. Fed. R. Civ. P. 56(e)(2).

signed the form indicating they had the opportunity to review the evaluation. [48-8] at 5.

Victor and Creel met in late April to discuss Victor's pay raise. [48] ¶ 29. Creel says that Victor complained about work-related issues and made disparaging comments about her coworkers. [48-2] 64:6–65:8. Creel says that Victor told her that (1) Victor was "dissatisfied with what she was paid," (2) that her peers make more money than she makes but do "absolutely nothing," (3) that Gulistan Vafai (one of her coworkers, [48] ¶ 92) is "useless," (4) that her peers should not receive any raises, and (5) that Victor could "run circles" around her coworkers. [48-2] 64:6–21. Victor denies making some, but not all, of these comments: according to her, she did not say that (1) she was dissatisfied with her raise, [42-8] 117:10–12, (2) her peers do absolutely nothing, [42-8] 118:12–16, (3) Vafai was useless, [42-8] 121:19–22, and (4) her peers should not receive any raises. [42-8] 119:6–120:7. Victor has not pointed to evidence that suggests she did not say that she could run circles around her coworkers.

The next day, Victor met with Creel and Wiser. [48] ¶ 30. Wiser says that, during that second meeting, Victor repeated some of the disparaging remarks she had made the previous day. [42-6] 94:12–15, 96:22–97:16, 101:25–102:1. *See also* [42-12] at 2. Wiser says that Victor said that a "bunch of monkeys could do what her coworkers do." [42-6] 93:20–23. Creel says that they spoke about communication and about how Victor could be "a member of a team," and that Victor was angry, still not

"accepting the management decisions of [] Wiser," and speaking in an "insubordinate" way. [48-2] 65:15–66:2.

Victor says that, during this second meeting in late April, Creel accused her of acting "ungrateful," but that neither Wiser nor Creel told her that she used unprofessional, disrespectful or threatening language, or that she had refused to accept a reasonable request from her supervisor. [52] ¶ 91; [42-17] 106:8–114:18. She does not dispute that she made the statements that Wiser attributed to her.[6]

At some point later, Rebecca Boland (Teen Librarian and Assistant Head of Popular Materials) says that Victor told her that Victor was working on a shift schedule despite having been told not to by Wiser. [48] ¶ 10; [42-7] 22:3–25:8. Victor denies having said this, [42-8] 135:20–136:10, and says that when she tried to file a formal complaint against Boland for making what she says was a false accusation, she was "refused the opportunity." [42-17] 136:1–9. Wiser says that she never told Victor not to work on the schedule, but that she did tell Victor that she wanted to discuss the schedule with her at a later date, and that Victor sent her an email that seemed to suggest that Victor understood that the schedule would eventually be taken away from her. [52] ¶ 113; [42-6] 122:5–125:14.

Another meeting took place in mid-May, this time between Victor, Wiser and Boland. *See* [48] ¶ 32. Boland left early and reported hearing shouting through a closed door after she left. [42-7] 33:3–19. Creel says she decided to check-in on the

---

[6] Again, Victor disputes that she made these statements in her Local Rule 56.1 statement, but the testimony she cites ([42-8] 118:12–120:5) does not contradict Wiser and Creel's accounts. [42-8] 109:22–120:5.

meeting after a few hours when she heard yelling from down the hall. [48-2] 106:10–108:12; [42-7] 20:14–17, 32:2–33:15.

Boland says that after the possibility was raised that someone else might take over one of Victor's responsibilities (managing the shift schedule), the meeting "quickly escalated" and Victor "got very heated and lost control." [42-7] 18:6–20, 26:1–7. She also says that the participants discussed Victor's communication style, her issues with insubordination, and the fact that Victor would be sent to training. [42-7] 21:21–22:2. At some point during the meeting, Boland says that she told Wiser about Victor's statement about working on the schedule despite having been told not to, [48] ¶ 73; [52] ¶ 112; [42-8] 135:15–136:10, and that Victor then called her a liar. [42-7] 26:1–7. Boland says that she began shaking during the meeting because she was so upset and afraid of Victor. [42-7] 94:4–97:23, 99:1–7.

Wiser says that Victor was "not in control of herself," that she was "threatening" and "intimidating," "leaning over" both Wiser's and Boland's desk and "shouting into [Boland's] face." [42-6] 129:13–19; 172:1–23. According to Wiser, Victor told her the shift schedule would fail if she was not in charge of it, refused to attend the training, refused to acknowledge that her behavior was questionable, would not accept Wiser's decision to put someone else in charge of the shift schedule, crossed her arms, rolled her eyes, stood by the door in such a way that Wiser could not leave the room, used extreme and profane language, and said she could not believe that Wiser would question her behavior. [42-6] 118:5–18; 128:14–20; 172:1–23.

8

Creel says that she arrived at the meeting late, but that by the time she entered the room, Wiser was hunched-over and looked like she was about to cry. [48-2] 107:24–108:7. Creel also says that Victor was yelling, hovering over Wiser's desk, and "appeared to be very angry." [48-2] 108:7–108:12.

Victor does not dispute that she attended the meeting, and does not dispute that she was informed that someone else would take over the shift schedule. [48] ¶ 32. She says that after being accused of being insubordinate, she asked Wiser and Boland to list specific examples of her insubordination, and neither could do so. [42-8] 139:15–140:2. She says she was upset but not yelling, *id.* 136:19–137:7, and that part of the reason she was upset was that, before that meeting, she had received no written or verbal warnings and had never been talked to about her conduct or behavior. [42-8] 147:9–17. Instead, she says she was a "perfect employee." [42-8] 147:2–3. She says she never said the schedule would fail without her, never refused to take training or a communication class, and never rolled her eyes or said that the request was "unbelievable." [42-8] 134:22–24, 136:19–137:7, 154:19–155:10. She adds that, again, neither Boland nor Wiser told her that she had used unprofessional, disrespectful or threatening language, or that she had intentionally refused to accept a reasonable request. [42-17] 125:18–126:1. She also says that, when she asked whether she was being reprimanded, Wiser and Boland told her she was not. [52] ¶ 89.

The next day, Womack says that Creel and Wiser told him about what had happened during the meeting. *See* [42-3] 104:20–105:5. Womack said that he was struck by the fact that Creel had heard "shouting from behind two closed doors and a

couple hundred feet away," and that Victor had been insulting and belittling to other staff and had refused to take reasonable directions (e.g., attend a communication class). [42-3] 105:14–18, 106:4–24.

Womack, Creel, and Wiser then started talking about whether Victor's actions merited discipline. *See* [42-6] 129:9–130:16. Wiser says she was in favor of terminating Victor because Victor refused to take direction from Wiser, because she believed Victor's refusals would continue into the future, and because she believed those refusals would create a toxic work culture. [42-6] 130:12–16. Creel recommended termination because, among other things, Victor was not "showing any remorse" and was not "accepting management decisions," [48-2] 113:2–6; 115:2–116:2, and because Victor never acknowledged that her behavior was unprofessional or disrespectful. [48-2] 152:1–6.

Victor says that she was not given the opportunity to express remorse. [48] ¶ 41; [42-8] 157:15–163:22. Victor had the day after the mid-May meeting off work, [42-8] 157:15–20, and, on that day, Wiser called her and told her to stay home again the following day because she was being suspended. [42-8] 157:23–158:18. Wiser also told her that a meeting had been scheduled for May 18, and that Womack, Christianson and Creel would attend. [42-8] 158:24. Victor then emailed Christianson and left her a voicemail. [42-8] 158:24–160:14. Victor has not pointed to evidence in the record suggesting that she apologized or expressed remorse during her call with Wiser or in her voicemail or email to Christianson.

Victor was terminated on May 18, 2017. [48] ¶ 52. The Library provided her with a termination letter that says the reason for her termination was her "repeated inappropriate behavior and communication." [42-16] at 2. It says that these issues were discussed with her during four different meetings that occurred between December, 2016 and May, 2017. *Id.* It also cites her "unprofessional, disrespectful and threatening language" and her "willful and intentional refusal to accept a reasonable request by [her] supervisor." *Id.* Victor says that she disputes the "accuracy of the meetings and conduct identified in the termination letter," but does not dispute that she was terminated "for the reasons identified in the cited termination letter." [48] ¶ 52. At the same time, she says that the "entire letter is fabricated besides her name and address." [42-17] 81:4–15. Womack says that, during the meeting held on that same day, Victor brought documents and was defensive and blamed what had happened on other people. [42-3] 212:23–2:14:5.

After Victor's termination, Wiser says she "sunsetted" Victor's shift supervisor position. [48] ¶ 71; [42-6] 218:23–219:16. She says she did this because she wanted to remove an unnecessary layer of communication between her and the staff, because they did not need a staff member overseeing passports any more, and because the "need was desk coverage." [48] ¶ 71. Wiser personally took over managing the shift schedule and absorbed some of the supervisory aspects of Victor's job. [48] ¶ 71; [42-6] 219:10–22.

At the same time, the library hired two part-time information desk assistants. [48] ¶ 71; [42-6] 219:19–22. One of the new assistants (Kourtney Collette) was over

forty years old, [48] ¶ 69, and the other (Gretchen Stroner) was under forty years old. [52] ¶ 100.[7] Another information desk assistant hired after Victor's termination (Selicia Applegate) was under forty years old, but is no longer employed at the Library. [48] ¶ 70; [42-6] 12:19–13:10. At around the same time, another employee (Amanda Novak) was moved from part-time to full-time. [42-6] 70:9–13; [48] ¶ 68. Womack does not believe that Novak took over any of Victor's job duties. [42-3] 186:21–24. Victor says that Novak was under forty years old, [42-8] 72:8–76:11, and says that all the women were hired to "replace [Victor's] hours," [42-8] 77:11–15; [42-17] 6:13–24, and that Victor used to "do a lot of the tasks that [Novak, Collette, Stroner, and Applegate] do now." [42-17] 8:15–17.

Victor says that two other Library employees were angry or rude at work and were not terminated. The first is Chris Williams, formerly the Library's full-time Makerspace Coordinator. [52] ¶ 104.[8] Wiser was also Williams's supervisor. [52] ¶ 104. Wiser says that Williams "came to work unwell" and very stressed one day, and, after being reminded about a meeting, became stressed, had an "outburst," and did not attend that meeting. [42-6] 32:17–35:2. He was sent home and, when he returned the next day, was "very, very remorseful," and "apologized multiple times" before agreeing to take time off to recover. [42-6] 34:14–35:2; [42-7] 64:1–11.

---

[7] In its response to Victor's Local Rule 56.1 Statement asserting that Stroner was under forty years old, the Library did not dispute that Wiser "testified as such." [52] ¶ 100. This does not controvert the assertion, so it is deemed undisputed that Stroner was under the age of forty.

[8] Victor says that Williams was under forty years old, but does not cite evidence that supports that assertion. *See* [52] ¶ 104 (citing [48-11] at 2, 3) (two pages purporting to reflect Williams's signature and the date that he completed that signature, but not indicating his age).

According to Wiser, Williams never shouted or swore at her. [48] ¶ 63. Creel, Wiser and Boland say that Williams took time to consider his behavior, gave an explanation for his conduct, and agreed to go part-time, take a training and have weekly one-on-one checkups. [48] ¶ 64. No employee reported feeling threatened by Williams, [48] ¶ 67, and both Womack and Creel say that no other employee was put in a position where they were made afraid of Williams. [42-3] 195:24–196:2; [48-2] 165:9–15. Williams was not terminated and was allowed to reduce his hours and responsibilities. [52] ¶¶ 105, 107.

Victor says that Wiser and Vafai told her about outbursts[9] that Williams made. [42-8] 81:17–82:12. According to Victor, Williams "flew off the handle" and told Wiser to "F off and leave him the F alone" after Wiser walked up to Williams and asked him why he had failed to attend a CPR training. [42-8] 81:13–82:8. Shortly after Wiser walked away, Victor says that Vafai approached Williams to ask if he was alright and tried to put her arm around his shoulder, at which point Williams "swatted" her arm away and said, "I don't know why people have to keep touching me, why they can't just leave me the F alone." [42-8] 83:11–21. Victor says that she thought Wiser was on the verge of tears after this happened. [52] ¶ 93. Victor did not personally witness either outburst, and instead heard about both through Wiser the next day, when Wiser called Victor into her office, closed the door, and told her about what had happened. [42-8] 83:2–13. Victor says that Vafai also told her about the first outburst.

---

[9] It is not clear whether Victor's testimony was that Williams engaged in two outbursts, or whether Victor told two, slightly different versions of the same outburst. *See* [42-8] 81:13–84:15. Taking the facts in the light most favorable to Victor, I assume she heard about two.

[42-8] 82:7–8. Victor submitted an untitled document (which Victor referred to as "Chris Williams' Disciplinary Recommendations") which says that Williams had "exhibited signs of emotional distress" and reported "feeling very overwhelmed." [48-12] at 2.[10]

Womack says that, according to what he heard from witnesses to the actual offense, Williams's response was "worlds apart from the complete refusal to accept coaching and discipline and redirection in terms of the communication style that [Victor] had and sort of the ongoing insubordination with respect to following directions from [Wiser] that that was part of a pattern." [42-3] 195:15–23.

The second allegedly similarly situated comparator is Daryl Behling. [52] ¶¶ 108–111. Behling was accused of "bullying other [Library] staff members, which included speaking about employee's eating habits, commenting on parenting skills, and making fun of Asian culture," and making "rude inappropriate comments to staff, racial and religious remarks about patrons, and tampering with belongings and temperature controls of staff." [52] ¶ 108. Victor made several of these accusations. [48-2] 93:18–94:10. Victor also submitted a document that purports to be a separation agreement between the Library and Behling. [48-14]. That agreement states that Behling was given one month's salary as consideration for the agreement. *Id.* Womack says that Behling was "given a chance to either resign or face a pretty

---

[10] Victor's Local Rule 56.1 Statement says that Williams refused to report to Wiser and failed to attend a mandatory training. [52] ¶ 105. In the testimony Victor cites to support that assertion, when asked, "do you know whether [Williams] did end up attending that training that he'd forgotten about," Boland answered, "I don't recall. I don't believe so." [42-7] 64:12–14. The cited testimony does not create a genuine dispute, and Victor's assertion has been disregarded.

serious investigation," [52] ¶ 111, and Creel says that Behling chose to resign. [48] ¶ 61.

The Library's employee handbook states in part that, "[i]n order to maintain a productive, safe, and efficient work environment, the Library requires employees to conduct themselves in an appropriate manner at all times." [42-5] at 13. It also lists certain "breaches of conduct" that "could result in disciplinary action up to and including termination." *Id.* Among them are "[i]nsubordination or failure to perform reasonable duties which are assigned," "[r]ude, discourteous, or unprofessional behavior," and "[e]ngaging in such other practices that may be inconsistent with the ordinary and reasonable rules of conduct necessary to the welfare of the Library, its employees or patrons." [42-5] at 13–14. Victor was aware of the handbook and understood that the rules applied to all Library employees, [42-17] 100:7–12, and says that, "based on the discrimination charges that [she has]," the rules were "not applied equally from males to females, from older people to younger folks and people of different interfaith marriages." [42-17] 70:7–22.

## III. Analysis

Victor brings four claims: one for discrimination on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, [1] ¶¶ 155–165, 42 U.S.C. § 2000e–2000e-17, one for discrimination on the basis of religion (also in violation of Title VII), [1] ¶¶ 166–176, 42 U.S.C. § 2000e–2000e-17, one for age discrimination in violation of

the Age Discrimination in Employment Act, [1] ¶¶ 145–154; 29 U.S.C. §§ 621–634, and one for defamation *per se.* [1] ¶¶ 177–182.

## A.     Title VII Discrimination

Title VII prohibits "discriminat[ing] against any individual … because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. Victor may prove her Title VII claims "either directly or indirectly, and with a combination of direct and circumstantial evidence." *McKinney v. Office of Sheriff of Whitley Cty.,* 866 F.3d 803, 807 (7th Cir. 2017). The inquiry is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.,* 834 F.3d 760, 765 (7th Cir. 2016).

Victor has elected to proceed under the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973); *see also McKinney*, 866 F.3d at 807; *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); [47] at 3–10. Under that framework, Victor carries the initial burden of establishing a prima facie case of discrimination. *McKinney*, 866 F.3d at 807; *McDonnell Douglas,* 411 U.S. at 802. She can accomplish this "by setting forth evidence that: '(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than [Victor].'" *McKinney,* 866 F.3d at 807. If she does so, she is entitled to a "presumption of discrimination," and the burden shifts

back to the Library "'to articulate some legitimate, nondiscriminatory reason' for its employment decision." *McKinney,* 866 F.3d at 807 (quoting *McDonnell Douglas,* 411 U.S. at 802). "When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a 'pretext,' which in turn permits an inference of unlawful discrimination." *Id.* (quoting *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012)).

### 1. Discrimination on the Basis of Sex

Victor is a member of a protected class. [41] ¶ 9; [48] ¶ 3. She was terminated, [48] ¶ 52, and termination is an adverse employment action. *Barton v. Zimmer, Inc.*, 662 F.3d 448, 456 (7th Cir. 2011).

The legitimate expectations analysis "does not merely consider whether a plaintiff's actual job performance was satisfactory—it is a much broader analysis, which allows fact-finders to consider factors such as insubordination and workplace camaraderie." *Zayas v. Rockford Mem'l Hosp.,* 740 F.3d 1154, 1158 (7th Cir. 2014) (finding that repeated failures to comply with written warnings can be sufficient to establish that the plaintiff in a Title VII case was not meeting legitimate expectations). The analysis "envisions a bifurcated inquiry, *i.e.*, whether the employer's expectations were legitimate and if so, whether the employee was meeting those expectations." *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 463 (7th Cir. 1986). This looks first at "whether the employer communicated those expectations to the employee and whether those expectations were unreasonable." *Id*. It requires only "a cursory examination into the reasonableness of the employer's expectations." *Id*. at

463 n.3. *See also Coco v. Elmwood Care, Inc.,* 128 F.3d 1177, 1179 (7th Cir. 1997) ("[l]egitimate expectations" means "simply bona fide expectations, for it is no business of a court in a discrimination case to decide whether an employer demands 'too much' of his workers").

There is undisputed evidence that the Library communicated their expectations to Victor. Victor says that she knew about the employee handbook and that its rules applied to all employees, [42-17] 100:7–12, and her performance evaluations (which she reviewed with her manager) show that she was being assessed for her ability to act professionally and accept her manager's decisions. [48-8] at 9–10; [48-8] at 11. She also presumably knew the requirements of her job from her efforts to rewrite her own job description. [48-4] at 2; [42-8] 111:1–112:3.

Those expectations are not unreasonable. The Library provided a service to members of the public, and that service could have been better provided by friendly interactions between staff and members of the public. Maintaining a positive working environment also might have helped the Library attract and retain talented employees. It was also reasonable for the Library to expect that its managers assist with the task of managing, accept direction from their supervisors, and attend events that would help educate them on how to be better at their jobs.

Victor has produced evidence that she met some of the Library's legitimate expectations. First, there are her performance evaluations. Those evaluations remained at least partially positive right up until three weeks before her termination. [48] ¶ 14; [48-8] at 5, 11; [52] ¶¶ 81–84. Evidence that past performance was

satisfactory can be probative with regard to legitimate expectations, but what is critical is "performance *at the time* of the employment action." *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 901 (7th Cir. 2005) (emphasis in original); *Zayas,* 740 F.3d at 1158; *Leffel v. Valley Fin. Servs.,* 113 F.3d 787, 794–95 (7th Cir. 1997).

Even though Victor's most recent performance review was issued after some of the conduct that allegedly led to her termination, it was relatively close in time to the termination and acknowledged (albeit thinly) that Victor was having problems communicating. [48-8] at 3. But it was positive, and this is evidence favorable to Victor.

In addition to her performance reviews, there is Victor's testimony. For instance, Victor says that Creel told her she "must be really good," [42-17] 96:18–20, that she was a "perfect employee" and that allegations to the contrary were fabricated. [42-8] 147:9–12. In the context of a prima facie case, "[a] determination that an individual is performing a job well enough to meet an employer's legitimate expectations … may be based solely upon the employee's testimony concerning the quality of his work." *Williams v. Williams Elecs., Inc.*, 856 F.2d 920, 923 (7th Cir. 1988). This is true even in the face of the Library's evidence—which was plentiful—suggesting that Victor was not meeting their expectations; Victor has produced some evidence, and that evidence is enough for now. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 493 (7th Cir. 2000) (the plaintiff's burden is "low," and the "plaintiff's evidence on the prima facie case need not be overwhelming or even destined to prevail").

Victor may have failed to meet this element of the prima facie case if, instead of a raise and a primarily positive performance review, Victor had been "frequently … disciplined at varying levels of severity for [her] persistent behavior and attitude problems," and had received multiple written disciplines in a single year. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004). Considering only undisputed facts in a light favorable to Victor, this case is not like *Fane v. Locke Reynolds, LLP*, where the plaintiff completed her assignments but was nonetheless found to not be meeting legitimate expectations because she sent an abrasive email, failed to evaluate her own behavior, and received low evaluation scores. 480 F.3d 534, 540 (7th Cir. 2007). On this record, it cannot be said as a matter of law that she was failing to meet the Library's legitimate expectations.[11]

Despite carrying her burden on three of the elements of a *prima facie* case under *McDonnell Douglas*, Victor has failed to produce evidence that there was a similarly situated individual who was not in the protected class that was treated more favorably. *McDonnell Douglas,* 411 U.S. at 802–04. There is "no magic formula for determining whether someone is similarly situated," and "courts should apply a 'common-sense' factual inquiry—essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). Similarly

---

[11] But to be clear, it is immaterial whether the Library ever told her she was not meeting their expectations. *Fane,* 480 F.3d at 540 n.3 ("[w]hether [the plaintiff] had notice of her transgressions, whether termination was an extreme response to them, and whether [defendant] followed its own progressive disciplinary procedures are irrelevant to the issue of whether [plaintiff] was meeting the firm's legitimate expectations").

situated employees should be "directly comparable" to the plaintiff "in all material respects," but "need not be identical in every conceivable way." *Coleman*, 667 F.3d at 846. "In the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* at 847. *See also Abrego v. Wilkie*, 907 F.3d 1004, 1013 (7th Cir. 2018).

Victor proposes two comparators: Chris Williams and Daryl Behling. Williams and Victor had the same supervisor, [52] ¶ 104; [48] ¶ 9, and there is also evidence that they were subject to the same standards. Williams received and reviewed a copy of the employee handbook before the incident in question, [48-11], and the Library does not contest that the policies contained therein applied to him. *See* [52] ¶ 104. Both Williams and Victor worked in the Popular Materials department, [42-9]; [48] ¶ 15; [52] ¶ 104, and even though Victor and Williams had different job titles, a "difference in job title alone is not dispositive." *Coleman*, 667 F.3d at 848 (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007)). There is no reason apparent from the record why making an outburst at work would be more acceptable for a Makerspace Coordinator (Williams) than it would be for a Popular Materials Supervisor (Victor).

But the only evidence that Williams's conduct approached Victor's in terms of severity was Victor's testimony: she says that Wiser and Vafai told her that Williams told Wiser to "F off and leave him the F alone," [52] ¶ 92, and later swatted away

Vafai's arm and told her to leave him the "F alone," too. [42-8] 83:11–21. Wiser and Vafai are also the sources of Victor's assertion that Williams said he refused to report to Wiser. [52] ¶ 92. The Library says this is all inadmissible hearsay. *See* Fed. R. Evid. 801(c); Fed. R. Evid. 805; *Gunville v. Walker,* 583 F.3d 979, 985 (7th Cir. 2009) ("[a] party may not rely upon inadmissible hearsay to oppose a motion for summary judgment").

There are two layers to these statements: Williams's statements to Wiser and Vafai, and Wiser's and Vafai's statements to Victor. Williams's statements are not hearsay because they are not being introduced for their truth. Nor could they be; their content does not contain any verifiable factual assertion. What matters is whether he made those statements, not whether they are true.

Wiser's and Vafai's statements to Victor, on the other hand, were both hearsay. Statements that are not hearsay include statements offered against an opposing party that were made by that party's employee "on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). "The only requirement is that the subject matter of the admission match the subject matter of the employee's job description." *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003). *See also Williams v. Pharmacia, Inc.*, 137 F.3d 944, 950 (7th Cir. 1998) ("not everything that relates to one's job falls within the scope of one's agency or employment").

With regards to Vafai, neither party has pointed to facts establishing that Vafai was an employee or an agent of the Library at the time of the statements in

question, nor has either side pointed to facts establishing what Vafai's job responsibilities were at the time, making it impossible to assess whether her statements were hearsay. Victor had the burden of establishing that these statements were admissible. *See Bourjaily v. United States*, 483 U.S. 171, 176, (1987) ("when the preliminary facts relevant to Rule 801(d)(2)(E) are disputed, the offering party must prove them by a preponderance of the evidence"). Vafai's alleged statements about what Williams said are excluded as hearsay.

With regard to Wiser, Victor has not produced evidence sufficient to determine that Wiser was acting within the scope of her employment when she told Victor about Williams's alleged outbursts. Wiser's duties included oversight of the information desk and the popular materials collection, [48] ¶ 8, and Victor says that Wiser told her about the statements in question while both women were in Wiser's office the day after the alleged outbursts. [42-8] 83:2–84:15. But the conversation she describes was not necessarily one being carried out within the scope of either Victor's or Wiser's employment; it is not clear whether Wiser was informing Victor about what happened in furtherance of her management duties (e.g., in order to inform Victor of the reason for Williams's absence or in order to explain to Victor how not to act), or for personal reasons (e.g., idle chatter or curiosity).

Moreover, Victor's testimony was that Wiser herself did not witness the outburst that was allegedly directed at Vafai. [42-8] 83:14–18. There is no evidence in the record to establish that Vafai told Wiser about Williams's alleged conduct within the scope of her duties, nor any evidence that Wiser had personal knowledge

about this second outburst. The statements are inadmissible hearsay and lack foundation. There is no other evidence in the record that Williams and Victor engaged in similar conduct.

There are other ways in which Williams's and Wiser's conduct was too different to warrant comparison. Wiser says Williams's outburst was directed at himself, not her. [42-6] 72:10–20. Victor says the outbursts were directed at Wiser and Vafai, but again, the only evidence she has of that is inadmissible, Fed. R. Evid. 801(c); *Gunville,* 583 F.3d at 985, meaning that fact remains uncontroverted. Victor's conduct was directed at Wiser (although Victor does say that she was not yelling), *see* [42-8] 134:22–141:10; [48] ¶ 34, and that makes Williams's statements qualitatively different.

Victor argues that Williams's conduct violated the same handbook provision she was alleged to have violated. [52] ¶ 106; [47] at 8. *Davis v. Wisconsin Dept. of Corrections*, 445 F.3d 971, 978 (7th Cir. 2006) (holding that employees engaged in "identical rule violations" provided some indication that the offenses were of "comparable seriousness"). But again, the only evidence that supports her argument is inadmissible hearsay.

In addition, there are further "differentiating or mitigating circumstances." *Coleman*, 667 F.3d at 846. Williams was "very, very remorseful," and "apologized multiple times" the day after his alleged outbursts. [42-7] 64:1–11. He agreed to take steps to get better, and began taking some of them almost immediately. *See* [42-6] 34:6–36:17; [42-18]. Boland says that Williams was self-reflective and that he "asked

for opportunities to change and grow," and that, in contrast, Victor was "immediately combative" and that she "blamed everyone else for the situation." [42-7] 106:7–15. Wiser and Creel testified to similar effect. *See* [48] ¶¶ 64–65. Creel says that Victor "never acknowledged that her behavior was unprofessional, disrespectful." [48-2] 1–6. *See Khowaja v. Sessions*, 893 F.3d 1010, 1016 (7th Cir. 2018) (considering it "significant" to the similarly situated comparator analysis that the comparator did not defend his mistakes).

Victor says she was unable to express remorse because she was told to remain silent during her termination meeting. [42-17] 137:2–16. But Victor gives no reason why she did not express remorse during either of the days that fell between the mid-May meeting and the date she was terminated. *See* [48] ¶ 32; [42-16]. During those days, even though she was not at work, she both emailed and called Christianson and spoke to Wiser. [42-8] 157:23–160:14. She could have expressed her remorse in either of those communications, but there is no evidence that she did. Moreover, she says that, during her termination meeting, she was able to briefly raise her wish to file a formal complaint against Boland for her allegedly untrue statements. [42-17] 137:2–16. She did not use that opportunity to apologize, either. Williams apologized the day after his alleged conduct (which all occurred during the course of a single day). Victor's failure to apologize distinguishes her conduct from Williams's. Williams was

not sufficiently similarly situated to conclude that sex-based discrimination explains the difference in the way he and Victor were treated.

Behling is no more convincing as a comparator. Victor's briefing says he is a male, [47] at 9, but cites to a paragraph in her statement of facts that says nothing about his sex. [52] ¶ 108. The Library objects to her lack of proof. [53] at 8. Victor had the initial burden of establishing that Behling was a member of a different class, *McKinney,* 866 F.3d at 807, and she has failed to carry that burden.

Victor also failed to produce evidence regarding Behling's position at the Library. *See* [52] ¶ 108. She says that Behling "formerly worked as Head of Facilities," but cites no evidence in support of that assertion. *Id*. She also says nothing about Behling's supervisor, and does not point to any evidence that, as a former head of facilities, he (assuming he was a man) was subject to the same standards as she was. "Arguments that consist of conclusory allegations that are not properly developed are waived*." Johnson v. Advocate Health & Hosps. Corp*., 892 F.3d 887, 898 (7th Cir. 2018); *Moultrie v. Penn Aluminum Int'l, LLC*, 766 F.3d 747, 753–54 (7th Cir. 2014).[12] Considering all of the evidence in the light most favorable to Victor, Victor has failed to produce evidence that Behling was a similarly situated comparator.

Victor's miniature reduction-in-force argument fails, too. When someone is terminated from a unique position, an inference of discrimination can arise even in

---

[12] Behling's conduct was similar enough. As best the record reflects, Behling was accused of making "rude, inappropriate comments to staff, racial and religious remarks about patrons, and tamper[ing] with belongings and temperature controls of staff." [52] ¶ 108. Those accusations could describe some of Victor's alleged conduct, and if true, likely constitute a violation of the same employee handbook provision as Victor's conduct. [42-5] at 13–14; [52] ¶ 110. *Davis*, 445 F.3d at 978.

the absence of a similarly situated comparator so long as the "terminated employee's duties are absorbed by other employees not in the protected class." *Bellaver*, 200 F.3d at 495. The theory is that the "job really was not eliminated at all; because the fired employee's duties were absorbed by others, they were effectively 'replaced,' not eliminated." *Id. See also Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 693 (7th Cir. 2000) ("[i]n a mini-RIF, a single employee is discharged and his position is not filled"); *Simpson v. Office of Chief Judge of Circuit Court of Will Cty.*, 559 F.3d 706, 718 (7th Cir. 2009) (the mini-RIF analysis does not apply when a replacement is hired not long after termination, when other employees did not absorb the terminated employee's duties, and when the firing was for misconduct and poor performance).

Victor says her position was unique, [47] at 10, but she must point to evidence that supports this assertion. *Simpson*, 559 F.3d at 718–19. To the degree she cites to any, she cites the fact that her job title was "Popular Materials Supervisor." *See* [47] at 10. It is not enough to make an "abbreviated mention" of "uniqueness" without citing to the record and then conclude that the position was singular because there was only one person who occupied it. *Simpson*, 559 F.3d at 719.

Even assuming that was enough, Victor has failed to show that her position was absorbed by people outside her protected class. First, her position was not entirely absorbed. Some of her responsibilities were eliminated, Wiser took over

others, and the rest were largely taken over by new assistants—all women—that the Library hired following her termination. Her miniature RIF argument fails.

Victor also argues that she should not have to produce evidence that she met her employer's "legitimate expectations" or that there were similarly situated employees that were treated more favorably. [47] at 7. "When a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner (i.e., applied expectations to similarly situated male and younger employees in a more favorable manner), the second and fourth prongs of McDonnell Douglas merge—allowing the plaintiff to … proceed to the pretext inquiry." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002). But Victor has failed to produce the evidence that might justify merging the second and fourth prongs; neither Williams or Behling were sufficiently similarly situated to raise an inference of discrimination. And even if Victor says that the handbook rules were not "applied equally," [42-17] 70:7–22, that testimony is not enough on its own to meet the requirement set forth in *Peele.* 288 F.3d at 331 ("[i]f a district court determines that a plaintiff has failed to identify a similarly situated co-worker outside of her protected class, or that the co-worker identified by the plaintiff, while similarly situated, was not treated in a more favorable manner, it need not address any of the underlying allegations of disparate treatment").

Even if she had established a prima facie case under the *McDonnell Douglas* framework and was entitled to a presumption of discrimination, the burden would only "shift to the employer to articulate some legitimate, nondiscriminatory reason'

for its employment decision." *McKinney,* 866 F.3d at 807. The Library has done so: it has pointed to evidence that, during several meetings, Victor was insubordinate, threatening, and unable to communicate in a professional manner. *See, e.g.*, [42-6] 118:8–18, 129:13–19, 172:1–23; [42-7] 32:19–33:23, 97:1–23, 99:1–7. *See also* [48] ¶ 34. Some of the conduct is undisputed: Victor told her supervisor that it was "insane" that the Library wanted her to be "less conscientious," [42-10] at 2–3, told her supervisor's supervisor that her supervisor would not be able to carry out a direction she had just been given, [42-8] 62:1–15, and said that she could run circles around her coworkers. [48-2] 64:6–21. Such conduct constitutes a legitimate, non-discriminatory basis for terminating Victor. *See Everroad v. Scott Truck Sys., Inc.,* 604 F.3d 471, 480 (7th Cir. 2010); *Flores v. Preferred Tech. Grp.*, 182 F.3d 512, 515 (7th Cir. 1999) ("[i]nsubordination is a legitimate, nondiscriminatory reason for firing an employee"). Victor has produced no evidence, and does not argue, that, if true, this testimony would not amount to a legitimate, nondiscriminatory reason for terminating her employment.

Lastly, then, Victor can survive summary judgment if she can show that the Library's ostensibly legitimate, non-discriminatory justification is pretextual. *McKinney,* 866 F.3d at 807. "[P]retext means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000); *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992) ("the issue of pretext does not address the correctness or desirability of reasons offered for employment decisions" and instead "addresses the issue of whether the

employer honestly believes in the reasons it offers"). The question is whether Victor's "supervisor 'genuinely believed' she was insubordinate." *Johnson v. Koppers, Inc.*, 726 F.3d 910, 916 (7th Cir. 2013); *Everroad*, 604 F.3d at 478 n.2. Victor need only "offer evidence that supports an inference that the employer's nondiscriminatory reason for its action was dishonest." *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 413 (7th Cir. 2018). She can do so by identifying "such weaknesses, implausibilities, inconsistencies, or contradictions" in the Library's stated reasons for terminating her "that a reasonable person could find [it] unworthy of credence." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306, 311 (7th Cir. 2012). Better treatment of a similarly situated comparator is relevant to the pretext inquiry. *Coleman*, 667 F.3d at 853.

Victor admits that the Library fired her "for the reasons identified in the cited termination letter." [48] ¶ 52. This amounts to a concession that she cannot show that the stated reasons were pretextual. Even if one looks beyond this concession, Victor has not identified weaknesses and implausibilities in the Library's stated justifications that raise an inference that the justifications were dishonest. Victor testified that the "entire letter [was] fabricated besides her name and address," [42-17] 81:4–15, says she never received a written warning (which might otherwise have helped substantiate the Library's stated reasons for terminating her), denies most (but not quite all) of the conduct that the Library accused her of engaging in during the meetings in question, and casts doubt on the authenticity of some of the notes that purport to corroborate the decisionmaker's version of events from those meetings.

But on this record, that is not enough. She does not dispute that there was conflict between her and the Library, that other Library employees attended meetings that focused on her and her relationship with the Library, or that the conflict spanned more than five months and culminated in longer, more serious discussions. She has not identified some other similarly situated male at the Library that was being treated more leniently. Nor has she has pointed to any statements from Library employees suggesting bias.

She has also not pointed to any evidence that explains why so many employees at the Library all said the same thing about her behavior. For most of the meetings, at least two other people gave closely aligned accounts that depicted Victor as either very difficult to work with or downright insubordinate. Three people described Victor's behavior during the mid-May meeting in very similar terms, and those accounts suggest she was insubordinate, unreasonable, and at times even physically threatening. Even if Victor disagrees with their accounts, her evidence is insufficient to raise an inference that they engaged in coordinated effort to give the same false account of her conduct in order to hide the Library's discriminatory intent. *See Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002) ("[w]e have typically been wary of allegations based on nothing but an attempt to come up with a conspiracy theory and in particular where there is not a scintilla of evidence in the record before us to support [that] theory"). An inference of a conspiracy to get the stories straight might not be necessary in every case, but Victor's failure to raise one

here is an example of her failure to show that the Library did not honestly believe the reasons it gave for terminating Victor.

Summary judgment is not appropriate when the non-moving party gives a "detailed refutation of events which underlie" the employer's purported reasons for terminating the individual, so long as that refutation "demonstrates that the employer may not have honestly relied on the identified deficiencies in making its decision." *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994). Victor has refuted many, but not all of the events in question and, in context, that refutation does not demonstrate dishonesty on the Library's part. When the "evidence does not suggest that the [defendant] used performance reasons to cover its discrimination," and when, instead, the evidence "shows only that [the plaintiff] disagreed with how the [defendant] viewed his interactions with his supervisor" and how the defendant instead "took the word" of people present for those interactions, summary judgment is appropriate. *Seymour-Reed v. Forest Pres. Dist. of DuPage Cty.*, 752 Fed. App'x 331, 335 (7th Cir. 2018). At best, Victor's evidence shows that she disagreed with how the Library viewed her interactions with her supervisors. She has failed to establish a prima facie case.

Victor's failure of proof is even more clear under the test from *Ortiz,* 834 F.3d at 765 (the inquiry is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action"). A reasonable factfinder could not conclude that Victor's termination was motivated by

gender-based discrimination. There are no positive performance reviews that post-date the most egregious examples of her allegedly insubordinate conduct. Many different people said that Victor yelled at her supervisor, made threatening gestures at her supervisor and others, refused to accept direction from her supervisors, and acted in many other ways that were not in line with the Library's legitimate expectations. Victor says those people are lying,[13] but her denials are neither detailed nor complete enough to raise an inference that the people involved in her termination did not believe their stated reasons for terminating her. Lastly, Victor has not produced enough evidence to raise an inference that her termination was motivated by discriminatory intent; there are no similarly situated comparators, and her job responsibilities were all either absorbed or taken over by women that were either retained or hired to replace her. The Library's motion for summary judgment is granted on Victor's sex-based discrimination claims.

## 2. *Discrimination on the Basis of Religion*

Victor's religious discrimination claims are even less well-founded than her sex-based discrimination claims. To start, it is not clear that Victor is a member of a protected religious class. She says she is a member of a protected class because she "is married to a Jewish man and lives in an interfaith family." [1] ¶ 168. It is

---

[13] Even though Victor's testimony is "self-serving," I do not discount it for that reason. *Hill v. Tangherlini,* 724 F.3d 965, 967 (7th Cir. 2013) (the term "self-serving" "must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment"); *McKinney*, 866 F.3d at 814. It is true that, in certain circumstances, such testimony can be enough to create a genuine issue of material fact. *See Hill*, 724 F.3d at 967 n.1 (overruling cases that "suggest a plaintiff may not rely on 'self-serving' evidence to create a material factual dispute"). But those circumstances are not present here.

undisputed that her husband is Jewish, [48] ¶ 53, but she says that she does not know if she is still a practicing Catholic. *Id.* ("[p]laintiff doesn't know how to answer whether she is a practicing Catholic").

In any event, her religious discrimination claim fails for the same reasons her sex-based discrimination claims failed—namely, that she has failed to produce evidence that the Library's stated reasons for terminating her were pretextual. In addition, Victor's similarly situated comparators are even less comparable when it comes to her religious discrimination claims. Victor has not produced any evidence tending to show that either Williams or Behling married a person that practices a different religion than they do. [52] ¶¶ 104–111. Victor's briefing says that both Williams and Behling are non-Jewish males, but cites to paragraphs in her statement of facts that contain no evidence regarding either Williams's or Behling's religious beliefs or practices. *See* [47] at 7 (citing [52] ¶ 104); [47] at 9 (citing [52] ¶ 108). Even if she had cited evidence that supported this assertion, and even if her religious discrimination claim was based on her religion (rather than that of her husband), her claim would still fail because Victor herself is not Jewish, so neither of her comparators would be in a different class than her. *See* [48] ¶¶ 53, 54. Such evidence is necessary to suggest that the Library's disparate treatment of Victor can be explained by her marriage to (or association with) someone of the Jewish faith. That evidence was necessary to support her claim. *McKinney,* 866 F.3d at 807.

And again, Victor's mini-RIF claim fails for the same reasons it failed with regard to her gender discrimination claim. In addition, she has also failed to produce

evidence that any of the women that were hired after her departure were not married to a person of a different faith (or otherwise did not associate with people of a different faith). Victor asserts in her briefing that Novak, Applegate, and Stroner were each not Jewish, [47] at 10, but the paragraphs she cites contain no evidence about their religious practices or beliefs—or the religious practices or beliefs of their spouses (or any evidence that they have spouses at all). *Id.* (citing [48] ¶¶ 68, 70–72; [52] 100–103).

Wiser's allegedly discriminatory statements were too innocuous and isolated to support an inference of discrimination. Comments that are isolated and remote in time from the adverse action generally do not justify an inference of discrimination. *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 602 (7th Cir. 2011). Stray remarks can be enough when they are "(1) made by the decisionmaker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Egonmwan v. Cook Cty. Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010). Comments made in social settings are even less probative of discriminatory intent. *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 885 (7th Cir. 2016). "Ambiguous" comments (i.e., those that are "devoid of any indication that [the] alleged motivations" were related to the characteristic at issue) are also not relevant to the analysis. *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 604 (7th Cir. 2012).

Wiser's statements about how Victor should raise her child were allegedly made at least four months (and likely closer to five months) before Victor was terminated. [42-17] 75:20–77:6; [48] ¶ 52. Victor says this statement was made in a

social setting, (i.e., a holiday party, [42-17] 75:20–77:6). Victor produced no evidence tending to suggest when Wiser told her that she might be calmer if she had more religion in her life. That statement has nothing to do with the fact that Victor was in an interfaith marriage. Neither reference the adverse employment action in any way. They are insufficient to raise an inference of religious discrimination. The Library's motion for summary judgment is granted on Victor's religious discrimination claims.

## B.    The Age Discrimination in Employment Act

Victor's age discrimination claim requires that she prove "that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). At this stage, she may proceed either by introducing direct or circumstantial evidence, or under the same burden-shifting framework that applies to her Title VII claims. *Carson v. Lake Cty., Indiana*, 865 F.3d 526, 532–33 (7th Cir. 2017); *Dale*, 797 F.2d at 462 n.1. The difference is that a reasonable jury must be able to conclude, after considering all of the admissible evidence, that Victor "suffered an adverse action *because of* her age." *Carson*, 865 F.3d at 533 (emphasis in original). The ultimate question is whether the Library would have treated Victor any differently if she were younger. *Grimm v. Alro Steel Corp.*, 410 F.3d 383, 386 (7th Cir. 2005).

There is no dispute that Victor was over the age of forty during all times relevant to her claim, *see* [41] at 12, [48] ¶ 3, meaning she is in a class protected under the Age Discrimination in Employment Act. 29 U.S.C. § 631(a). And again, there is

no dispute that Victor suffered an adverse employment action. *Barton,* 662 F.3d at 453–454.

But still, her claim fails for the same reasons as her sex-based and religion-based discrimination claims; she has failed to produce evidence that the Library's stated reasons for terminating her were pretextual. Her similarly situated comparator evidence is weaker with regard to her age discrimination claim than it was with regard to her sex-based discrimination claim. First, there is no evidence in the record that Williams was under forty years of age at the time he allegedly "flew off the handle." *See* [42-8] 81:13–83:13. Victor asserts that Williams was less than forty years old at the time, [52] ¶ 104, but the only evidence Victor cites in support of that assertion are two signature pages showing that Williams received the employee handbook. [52] ¶ 104 (citing [48-11] at 2–3). Both pages reflect the date that he signed, but not his birth date. Without that evidence, Williams is not an acceptable similarly situated comparator. *McKinney,* 866 F.3d at 807. Victor does not even allege that Behling was under 40 years of age. [48] ¶ 108–111.

Victor has produced evidence that one of the employees that was hired after her termination (Applegate) was under forty years old. [48] ¶ 70 (citing [42-6] 222:16–24). Victor also says that two other employees (Stroner and Novak) were in their twenties. [42-17] 6:11–24. She has also pointed to evidence (again, her own testimony), that the younger women that were hired "did a lot of the tasks" that Victor had previously performed. [42-17] 8:13–17.

The "fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the McDonnell Douglas prima facie case." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996). This is because it is still possible to discriminate against a 68-year-old "because of her age" by hiring a 65-year old. *Id.* As a result, "the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." *Id.* at 313.

At least two of the women that the Library allegedly hired following Victor's termination were more than ten years (and potentially as many as nineteen years) younger than Victor. *See* [48] ¶ 70 (citing [42-6] 222:16–24); [42-17] 6:11–24, 8:13–17. But Victor has produced no evidence about the job performance of the people that allegedly replaced her, nor any evidence that they engaged in conduct similar to her, nor any evidence about them whatsoever, beyond their ages, their positions, and that they were hired into positions that involved performing some of the same tasks that Victor used to perform. *See* [48] ¶¶ 68–72; [52] ¶¶ 99–103. "[I]t simply cannot be enough in a termination case that the employer merely retain younger employees" despite terminating the plaintiff. *Gadsby v. Norwalk Furniture Corp.*, 71 F.3d 1324, 1333 (7th Cir. 1995). Her miniature RIF claim fails, too, for the same reasons that it failed in the context of her sex-based and religion-based discrimination claims, and in light of the fact that, in the context of her age-discrimination claim, she explicitly argues that the position was filled by others. *Michas*, 209 F.3d at 693 ("[i]n a mini-RIF, a single employee is discharged and his position is not filled"). Victor has failed

to produce sufficient evidence of similarly situated comparators to support her age discrimination claim.[14] The Library's motion for summary judgment on the age discrimination claim is granted.

## C. Defamation *Per Se*

Because Victor has no remaining federal claims, her state-law claims are dismissed for want of federal jurisdiction. 28 U.S.C. § 1367(c)(3); *Paramount Media Grp., Inc. v. Vill. of Bellwood*, No. 17-1562, 2019 WL 3161843, at *5 n.2 (7th Cir. July 16, 2019). Although the parties have briefed the merits of summary judgment on the defamation claim, "the principle of comity encourages federal courts to relinquish supplemental jurisdiction pursuant to § 1367(c)(3)" when they resolve all federal claims prior to trial. *Hansen v. Bd. of Trustees of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 607 (7th Cir. 2008). Here, there is no federal interest in the remainder of the parties' dispute; the state courts have a greater interest in interpreting Illinois defamation principles and should be given the opportunity to resolve that claim.

---

[14] Victor adds that the fact that the Library replaced her with employees that are not in her protected class is evidence of pretext, but she cites no law for this proposition, other than to say that "[c]omparator evidence is also relevant to the pretext inquiry." [47] at 10 (citing *Coleman*, 667 F.3d at 853). That may be, but Victor has failed to make out a prima facie case of age-based discrimination, so any discussion of the pretext inquiry is premature.

## IV. Conclusion

The Library's motion for summary judgment, [40], is granted. Enter judgment and terminate civil case. The state-law claim is dismissed without prejudice.

ENTER:

Manish S. Shah
United States District Judge

Date: July 19, 2019